IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

BILLERUD AMERICAS CORPORATION,

                       Plaintiff,                OPINION AND ORDER

    v.

                                                  22-cv-194-wmc

UNITED STEELWORKERS OF AMERICA
LOCAL UNION NO. 2-94,

                       Defendant.
---

      In this lawsuit, brought under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, plaintiff Billerud Americas Corporation seeks to vacate an arbitration award to defendant United Steelworkers of America Local Union No. 2-94 ("the Union") for vacation pay during an indefinite idling of Billerud's mill in Wisconsin Rapids, Wisconsin. The Union seeks an order confirming the same award. Before the court are the parties' cross motions for summary judgment. (Dkt. ##17, 20.) For the reasons that follow, the court will deny Billerud's motion, grant the Union's motion, and affirm the arbitration opinion and award.

UNDISPUTED FACTS[1]

**A. Background**

      Billerud produces printing and writing paper at a facility in Wisconsin Rapids, Wisconsin. The Union represents production and maintenance workers employed by

---

[1] Unless otherwise noted, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact, as well as the underlying administrative record ("AR") jointly submitted by the parties (*see* dkt. #13). However, in considering the parties' cross-motions for summary judgment, the court must "construe the record in the light most

Billerud under a collective bargaining agreement ("CBA"), which became effective on April 1, 2010, and was extended through the period relevant to this lawsuit. (AR 111.)

Under the CBA, Billerud "recognizes the Union as the sole and exclusive collective bargaining agent governing wages, hours, and other terms and conditions of employment" for these workers. (AR 118.) Moreover, the CBA's grievance procedure allows the Union to grieve "any dispute with [Billerud] initiated by the employee and/or the Union concerning the effect, interpretation, application, claim of breach, or violation of this Agreement." (AR 208.) And if the parties are unable to resolve a grievance, the Union may appeal to an arbitrator, who "will render a decision to be final and binding upon both parties." (AR 211.) Still, the CBA limits the authority of the arbitrator in the following respect:

> It is understood that the function of the arbitrator shall be to interpret and apply this Agreement. However, the arbitrator shall have no power to add to or subtract from, or to modify and extend any of the terms of this Agreement, or any agreement made supplementary hereto except by mutual consent of the Company and Union involved.

*Id*.

### B. Effects of the Indefinite Idling of Paper Mill Bargaining Rights

In June 2020, Billerud issued letters to employees represented by the Union,[2] stating that "the Company will indefinitely idle and implement layoffs at its facility . . . beginning

---

favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

[2] The letters served as notice under the Federal Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. § 2101 *et seq*.

on July 31, 2020," explaining further that "[t]his action is indefinite in nature and may become permanent." (AR 282.) Billerud and the Union then engaged in what the parties refer to as "effects bargaining" regarding this action. The parties met six times and exchanged written proposals in an effort to negotiate an agreement about various issues, including severance pay, vacation time, and recall rights.[3] During those negotiations, the parties agree that Billerud did not know whether it would: (1) restart the mill and recall employees; (2) sell the mill; or (3) permanently shut the mill down.

On July 29, 2020, the parties reached a memorandum of agreement ("MOA"), which set August 2, 2020, as the effective, initial layoff date for most employees and provided the following with respect to the effects on severance pay, vacation and holidays, and recall rights:

- **Section 2. Severance**: "Severance will be based on the number of weeks of vacation an employee was eligible for as of the date of the layoff (August 2)." (AR 273.) Fifty percent of the severance pay was to be paid within 90 days of the employees' layoff date, and the remaining 50 percent was to be paid no later than December 31, 2020.

- **Section 4. Vacation and Holidays**: "Unused vacation, accrued vacation, banked vacation, banked holidays, and banked call time not used as of the date of layoff will be paid out per the severance payment schedule.[4] Anyone laid off

---

[3] Under § 13 of the CBA, employees are eligible for between one and seven weeks of paid vacation each year based on their length of service. The vacation year runs from May 1 to April 30 of the following year, and each week of vacation is worth 48 hours of pay. Employees earn vacation for the following vacation year based on hours worked or credited during the current vacation year. However, the CBA distinguishes "recall rights" available in a layoff from "rehire rights" available if the plant permanently shuts down.

[4] "Unused vacation" refers to the number of weeks of vacation an employee has not yet taken during the current vacation year; accrued vacation refers to the pro rata amount of vacation an employee has earned for the following vacation year based on hours worked or credited during the current vacation year; and banked vacation refers to the amount of vacation an employee has banked for retirement.

> after December 31, 2020 will be paid within (2) weeks of being laid off or on the next scheduled pay date." (AR 275.)
>
> - **Section 25. Recall**: "Employees will be recalled to bumpable positions by mill seniority. Recall to an employee's former department will be based on mill seniority and qualifications." (AR 279.)

However, the MOA did not address eligibility for vacation pay accrued after employees were placed on indefinite layoff.

Effective August 2, 2020, Billerud indefinitely idled the Wisconsin Rapids plant and laid off most of the employees represented by the Union. Billerud permanently shut the paper mill down on October 31, 2020, terminating all employees who had been laid off.

## C. Grievance and Arbitration

Within 90 days of their effective layoff date, Billerud paid eligible employees 50% of the vacation accrued as of that date and the remaining 50% by December 31, 2020, but it did not pay employees for vacation that accrued during the indefinite idle period itself, running for most employees between the effective August 2 layoff date and October 31, 2020, their termination date. In response, the Union filed a formal grievance on September 9, 2020, arguing that Billerud failed to compute vacation hours properly for the indefinite idle under § 13(B)(4) of the CBA, which states that "[h]ours lost due to temporary shutdowns will . . . be credited in establishing minimum hours to qualify for a vacation."[5] (AR 179.) Billerud disputed the grievance, arguing that: (1) the CBA addresses vacation accrual for hours lost due to temporary shutdowns, not an "indefinite

---

[5] Subsections 13(B)(2) and (3) also allow an employee to accrue vacation time while the employee is on union business or on leave for up to six months because of accident, sickness, or workers' compensation.

4

idle"; and (2) the MOA only contemplated paying employees for vacation time accrued "as of the date of layoff." In contrast, the Union argued that the temporary shutdown language should be applied because: the CBA was silent as to any so-called "idling" of the mill; and the MOA could not be interpreted to bar employees from accruing additional vacation after a lay off. Because the parties were unable to resolve this grievance, the Union sought arbitration.

The parties proceeded to arbitrate their grievance before Arbitrator Charles Ammeson in a virtual hearing held via Zoom on October 21, 2021. Both parties had the opportunity to present evidence, call witnesses, and submit post-arbitration briefs. They also stipulated that there were no issues as to the arbitrability of their grievance, leaving the arbitrator with a single issue to decide:

> Whether the Employer violated the CBA by failing to credit employees for time they were laid off between August 2nd, 2020, when the mill was indefinitely idled, and October 31, 2020, when the mill was permanently shut down. If so, what is the appropriate remedy.

(AR 420-21.)

At the hearing, Billerud's Human Resources Director Charles Welch testified that before the indefinite idle period, the mill had previously shut down departments or areas in the mill for various reasons – e.g., equipment failures, scheduled repairs, or adjusting inventory levels. (AR 46-50.) These shutdowns were not only temporary, but the area affected by the temporary shutdown restarted once the issue was resolved. Moreover, during the most recent, temporary shutdown that occurred in May 2020 due to production levels exceeding customer orders, Billerud *notified* affected employees that the shutdown

5

would be temporary *and* they would be recalled to work once the shutdown ended. Further, unlike this time, the company did *not* send WARN letters to the employees affected by that shutdown, or for any other temporary shutdowns occurring before August 2020.

The arbitrator issued an opinion and award on January 13, 2022, granting the Union's grievance and ordering Billerud to pay employees for vacation accrued during the period from August 2, 2020 to October 31, 2020, when the facility was indefinitely idled but not shut down.[6]

OPINION

Section 301 of the LMRA grants federal courts the authority to review arbitration decisions awarded under a collective bargaining agreement. *Gen. Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963) (citing *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448 (1957)). However, "[j]udicial review of arbitration awards is extremely limited." *Prate Installations, Inc. v. Chi. Reg'l Council of Carpenters*, 607 F.3d 467, 470 (7th Cir. 2010). Courts should not "review the arbitrator's decision on the merits despite allegations that [it] rests on factual errors or misinterprets the parties' agreement." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam).

As such, "[a] reviewing court will enforce the arbitrator's award so long as it 'draws its essence from the contract,' even if the court believes that the arbitrator misconstrued its provisions." *United Food & Comm'l Workers, Local 1546 v. Ill.-Am. Water Co.*, 569 F.3d

---

[6] The court will discuss additional facts concerning the arbitrator's decision and cited reasoning as they become relevant to the analysis below.

750, 754 (7th Cir. 2009) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 38 (1987)). "It is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is *outside* the contract . . . that the award can be said not to draw its essence from the [parties' agreement]." *Id*. at 755 (quoting *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184-85 (7th Cir. 1985) (emphasis added)); *see also Anheuser-Busch, Inc. v. Int'l Bhd. of Teamsters, Local 744*, 280 F.3d 1133, 1137 (7th Cir. 2002) ("[O]ur concern is limited to whether the arbitrator went beyond, or outside, the bounds of interpreting the contract" and "disregarded the very language of the agreement itself."). "But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Paperworkers Int'l Union*, 484 U.S. at 38.

Here, Billerud asserts that the arbitrator sought to implement his own brand of justice by exceeding his authority to interpret the contract in three, key respects: (1) adding a non-negotiated provision to the CBA that allows employees to accrue vacation during an indefinite idle; (2) ignoring clear language in the MOA halting the accrual of vacation *as of* the indefinite layoff date; and (3) ignoring or misconstruing evidence of the parties' intent and past practice. For the reasons explained below, however, the court finds none of these challenges sufficient to overturn the arbitrator's decision under a deferential standard of review.

I. **CBA Language**

Billerud contends that the arbitrator's decision to allow accrual of vacation during

the indefinite idle *adds* a basis for receiving accrued vacation pay not expressly contained in §§ 13(B)(2)-(4) of the CBA. As set forth above, that provision states that employees can be credited for hours not actually worked in the following situations: leave of up to six months for accident, sickness, or workers' compensation; union business; and temporary shutdowns.[7] (*See* AR 178-79.) Contrary to Billerud's contention, therefore, the arbitrator did not add a completely new basis for accruing vacation time; rather, he interpreted the term "temporary shutdown" to include the indefinite idle that occurred at the Wisconsin mill.

While Billerud argues that an indefinite idle is not a temporary shutdown, the arbitrator acted within his authority in reaching a different conclusion after considering the language in § 13(B)(4) of the CBA and § 4 of the MOA. Specifically, while acknowledging that the terms "indefinite" and "temporary" are distinguishable, the arbitrator noted that neither agreement used "indefinite" as a contractual term. Rather, the CBA referred only to temporary and permanent shutdowns, and the MOA referenced recall rights, which would *not* be available if the mill was being permanently shut down. (AR 429-30.) Thus, when the parties could not agree, the arbitrator was charged with discerning as a matter of fact where an indefinite idle fell in the spectrum between the two. Reasonably enough, considering the hearing testimony of Billerud's witness, Welch, the

---

[7] While Billerud claims that § 13 of the CBA states that "employees can *only* be credited for hours not actually worked during the vacation year for four specific reasons" (dkt. #21 at 14 (emphasis added)), the CBA does not contain such limiting language, and instead includes separately numbered provisions allowing vacation accrual during accident and sickness leave, workers' compensation leave, union business, and temporary shutdowns.

8

arbitrator held that "it is abundantly clear that in July 2020[, Billerud] had not determined nor had communicated that the Wisconsin Rapids Mill was being permanently shutdown." (AR 429-30.) As such, the arbitrator concluded that "the term 'indefinite idle' is not reasonably interpreted or understood to be a 'permanent shutdown,'" while the term "temporary shutdown" is reasonably interpreted and understood to include the term "indefinite idle," and "[u]sing the word 'indefinite' does not clearly or reasonably communicate that the shutdown/idle was not temporary." (AR 431.) In doing so, whether or not a reviewing court would have reached the same result, the arbitrator was properly engaged in "construing or applying the contract," which was within the express "scope of his authority" under the CBA. *Paperworkers Int'l Union*, 484 U.S. at 38.

Nevertheless, Billerud argues that the arbitrator committed a serious error, but that alone does not suffice to overturn his decision. *Id*. In fact, the only arguably factual error Billerud identifies is what it characterizes as the arbitrator's misstatement that the MOA does not reference the term "indefinite idle," since the MOA mentions indefinite idle *once* in its preamble. However, the arbitrator's failure to recognize that mention did not matterially affect the outcome of his decision or warrant reversal of his award. *See Misco, Inc.*, 484 U.S. at 39 ("improvident, even silly, factfinding" is not basis for vacating arbitration decision).

As for its argument that the arbitrator overstepped his authority more broadly, Billerud cites four cases in which the Seventh Circuit criticized an arbitrator's attempt to add non-bargained for requirements to a CBA under the guise of contract interpretation. *See Anheuser-Busch,* 280 F.3d at 1138, 1142 (Arbitrator cannot shield himself from judicial

9

correction by merely 'making noises of contract interpretation'."); *Polk Bros., Inc. v. Chicago Truck Drivers, Helpers & Warehouse Union*, 973 F.2d 593, 597-99 (7th Cir. 1992) (arbitrator went "well beyond his authority"); *Tootsie Roll Indus., Inc. v. Local Union No. 1*, 832 F.2d 81, 83-85 (7th Cir. 1987) (same); *Young Radiator Co. v. Int'l Union, UAW*, 734 F.2d 321, 325 (7th Cir. 1984) (Arbitrator "failed to confine himself to the terms of the collective bargaining agreement."). These cases are easily distinguished as a matter of law, since all address awards where arbitrators ignored express, unambiguous contractual language or clearly relied on policies or law outside the agreement, none of which the arbitrator did in this case. *See Anheuser-Busch*, 280 F.3d at 1138-40 (vacating award when arbitrator ignored express contractual language providing for specific commission rate for drivers and awarded different rate based on parties' past practice despite explicit contract language prohibiting arbitrator from considering past practice); *Polk Bros.*, 973 F.2d at 598-99 (vacating award when arbitrator relied on outside law in awarding backpay beyond express termination date of contract); *Tootsie Roll Industries*, 832 F.2d at 85 (vacating award when arbitrator relied on outside policy in reinstating grievant despite unambiguous language in last-chance agreement that she would be terminated for any absence); *Young Radiator*, 734 F.2d at 324-25 (vacating award when arbitrator based his decision solely on finding that employee's admission of theft was not "motivating cause" for discharge, despite clear contract language authorizing discharge for theft as just cause).

In contrast, Arbitrator Ammeson reasonably determined that the parties' CBA did not specifically exclude or include indefinite idle for purposes of vacation accrual, but could be read to include indefinite idle as a type of temporary shutdown. Indeed, as the Union

10

argues, the court of appeals has affirmed arbitration awards in which the arbitrator interpreted existing contract terms subject to more than one meaning or interpreted non-express but implicit contractual terms.  S*ee Northern Indiana Public Service Co. v. United Steelworkers of America*, 243 F.3d 345, 348 (7th Cir. 2001) ("[A]lthough the arbitrator was not empowered under the CBA to add terms to the [productivity reward plan], arbitrators are empowered to fill gaps left in contracts."); *Jasper Cabinet Co. v. United Steelworkers of America*, 77 F.3d 1025, 1029 (7th Cir. 1995) (upholding award where arbitrator found that concept of reasonable time limit was implicit in contract even though the contract did not explicitly set a time limit); *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987) (internal citations omitted) ("Contracts contain implicit as well as explicit terms, and arbitrators' authority to interpret the latter is as great as their authority to interpret the former.").

Regardless, the relevant question for this reviewing court is "whether the arbitrator interpreted the parties' collective bargaining agreement and reached a tenable result from the text of the agreement," *Brotherhood of Locomotive Engineers & Trainmen, Gen. Comm. of Adjustment, Cent. Conf. v. Union Pac. R. Co.*, 719 F.3d 801, 803-04 (7th Cir. 2013), and this is *exactly* what the arbitrator did in this case.  The arbitrator's award is rationally derived from the CBA, which allows employees to accrue vacation during a temporary shutdown.  Because the CBA does not address or define indefinite idles falls in the spectrum between "temporary" and "permanent," or in any way limit the meaning of the term "temporary shutdown" to include or exclude an indefinite idle, the arbitrator's interpretation is more

than tenable, especially having found as a matter of fact that *this* indefinite idle had the characteristics of a temporary shutdown, at least as originally adopted by Billerud.

Finally, while Billerud argues that the arbitrator's award makes absolutely no sense because the company could have been liable for accrued vacation for some time if it had not decided to permanently shut down the plant, that argument amounts to an attack on the merits of the arbitrator's decision, which is exempt from judicial review. *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960) ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies."). Moreover, the opposite argument is at least as reasonable: it was up to Billerud to declare a permanent shutdown and relieve itself of any further accrual of vacation under the CBA, which is exactly what it did.

## II. MOA Language

Next, Billerud argues that the arbitrator ignored unambiguous language in the MOA providing: in § 2, that severance will be based on the number of vacation weeks the employee was eligible for *as of* the date of layoff; and in § 4, that accrued vacation not used *as of* the date of layoff will be paid out per the severance payment schedule. Under Billerud's interpretation, these sections of the MOA tie vacation pay to the date of layoff. However, the arbitrator did not ignore this language. He expressly considered both and

Billerud's interpretation, then reached a different conclusion, which he was entitled to do.[8] The arbitrator even acknowledged that Billerud's witness, Welch, "may have subjectively meant and intended to communicate that there would be no further earning or accruing of vacation entitlement after the initial layoff," he found "nothing in Section 4 of the Memorandum Agreement that can be understood to communicate the same." (AR 431.) Rather, he reached the tenable conclusion that the cited provisions of the MOA simply define when Billerud had to pay employees for the vacation they had already accrued up until the date of their layoff, not whether vacation may continue to be accrued post-layoff at all. Regardless, having considered this language, the arbitrator acted within his authority in concluding, again as a matter of fact, that there had been no meeting of the minds on the question before him, causing him to rely on his interpretation of the CBA itself.

**III. Evidence of Intent and Past Practice**

Finally, Billerud argues that the arbitrator's decision is contrary to evidence regarding the parties' intent and Billerud's past notification practices during temporary shutdowns. In particular, Billerud contends that the arbitrator either ignored or failed to credit the following evidence adduced at the hearing:

- Welch's uncontradicted testimony that the company never communicated to the Union or its employees that the mill idling was only temporary.

---

[8] Billerud also notes that the arbitrator mistakenly assumed that Billerud was making an argument that the severance pay provision in § 2 of the MOA was meant to replace the vacation payment set forth in § 4 of the MOA. (*See* AR 432-33.) Again, under the deferential standard of review, however, any error by the arbitrator appears wholly inconsequential to his ultimate conclusion. *Paperworkers Int'l*, 484 U.S. at 38.

13

- During effects bargaining, Billerud provided the Union with anticipated cost information of accrued benefits through July 31, which was the anticipated date the indefinite idling and related layoffs would begin.

- During past shutdowns, as opposed to the final, indefinite idle, Billerud expressly designated the closing *as temporary* and notified employees accordingly.

However, the arbitrator *specifically* acknowledged Welch's testimony *and* the fact that Billerud had used different language in implementing temporary shutdowns in the past. Still, the arbitrator concluded the evidence as a whole suggested that Billerud's "indefinite idle" fell closer to a "temporary shutdown," then the permanent shutdown that came later, which he was entitled to do for the reasons set forth above.

In fairness, Billerud is correct in pointing out that the arbitrator did not specifically mention in his opinion the cost information for accrued benefits due at the beginning of the "idle." However, arbitrators are not even required to write opinions, let alone write thorough ones that respond to *every* argument raised by a party. *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1506 (7th Cir. 1991) ("It would be a serious practical mistake, moreover, to subject the reasoning in arbitrators' opinions to beady-eyed scrutiny . . . Arbitrators are not required to write opinions, any more than juries are . . . since arbitrators' interpretations must be accepted even when erroneous, it cannot be correct that arbitrators are required to write good opinions."). Even is such an explanation were required, the arbitrator's factual conclusion that the MOA simply addressed accrued vacation as of the beginning of the "idle," rather than addressing possibly accrued vacation benefits of a then unknown time period or amount is consistent with his interpretation of the CBA. In fact, it is perfectly plausible that both sides chose

14

not to address the issue at all, or any other benefits or obligations that may be continuing both before and after a permanent shut down until necessary.

Accordingly, none of the alleged errors and lapses in reasoning that Billerud attributes to the arbitrator warrant reversal of the arbitration decision and award in this case.

ORDER

IT IS ORDERED that:

1) Defendant United Steelworkers of America Local Union No. 2-94's motion for summary judgment (dkt. #17) is GRANTED, and plaintiff Billerud Americas Corporation's motion for summary judgment (dkt. #20) is DENIED.

2) The January 13, 2022 decision issued by Arbitrator Charles Ammeson is AFFIRMED.

3) The parties joint motion for a hearing (dkt. #33) is DENIED AS MOOT.

4) The clerk of the court is directed to enter judgment in favor of defendant and close this case.

Entered this 27th day of March, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge